UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

EDGEWOOD CONTRACTORS, INC.,

        Plaintiff,

    v.                                       Case No. 07-C-1093

CITY OF MUSKEGO,
BRIAN TURK,
SEAN McMULLEN,
JEFF MUENKEL,
JOHN DOES,

        Defendants.

---

## DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND DISMISSING CASE

        Edgewood Contractors Inc. ("Edgewood") alleges that the City of Muskego will not approve its proposals to develop thirty acres of land because its owner, Gayle Schmitt, is a woman. In addition to claims arising under state law, Edgewood asserts two theories under the Equal Protection Clause. Defendants moved for summary judgment on all claims. Subsequently, Edgewood agreed to dismiss its state law claims and disavowed any implied takings claim. Because Edgewood has failed to meet its burden on summary judgment, the defendants' motion will be granted and this case will be dismissed.

        Summary judgment is appropriate where the movant establishes that there is no genuine issue of material fact and entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Material facts may affect the outcome of the suit, and a material fact is genuine if a reasonable finder of fact could find in favor of the nonmoving party. *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Summary judgment is appropriate where a party has failed to make "a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

A party opposing summary judgment may not rest upon the mere allegations or denials of the adverse party's pleading, but must set forth specific facts establishing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). Any doubt as to the existence of a material fact is to be resolved against the moving party. *Anderson*, 477 U.S. at 255. For the purpose of resolving this motion, the following facts are undisputed. In addition to stipulated facts, the court has included Edgewood's proposed findings to the extent they are relevant and supported by evidence.

FINDINGS OF FACT

From approximately October of 1996 to 2002, Edgewood Contractors was a corporation owned by Gayle Schmitt and Charles Schmitt. Gayle Schmitt bought out Charles Schmitt's interest around 2002 and has owned 100% of the stock of Edgewood since that time. (Compl. ¶¶ 4004, 4015, 4025.)

The City of Muskego, a municipal organization, exists pursuant to Wisconsin law. (Compl. ¶ 302; Answer ¶ 302.) From 1999 to January of 2007, Sean McMullen worked for the City of Muskego as the Director of Engineering, Building Inspection and Facilities. McMullen was responsible for evaluating issues relating to sanitary sewers, water mains, storm sewers, engineering type development standards and road cross sections. (Doyle Aff., Ex. 1; McMullen Dep. 11.) He was not involved in the zoning or planning aspects of a development proposal, and did not vote on the approval of proposals

2

submitted to the City.  (Doyle Aff., Ex. 1; McMullen Dep. 11.)  Rather, McMullen reviewed development proposals and then advised the Plan Commission, Public Utilities Committee, Public Works Committee and the Common Council on the issues within his area of responsibility.  (Doyle Aff., Ex. 1; McMullen Dep. 13.)

Jeff Muenkel has worked with the City of Muskego since 2002.  He started as an Assistant Planner and became the Interim Planning Director in December of 2003 after Brian Turk left the City's employment.  Muenkel then became the Planning Director, and has served as the City of Muskego Community Development Director starting January of 2009. (Muenkel Aff. ¶ 2.)  As the Interim Planning Director and Plan Director, Muenkel's responsibilities included planning oversight, zoning, geographic information systems, urban forestry and conservation.  Muenkel reviewed development proposals and provided recommendations on such proposals to the Plan Commission and/or Common Council.  (Muenkel Aff. ¶ 3.)  He was not involved in voting on development proposals or the evaluation of sewer or stormwater issues.  (Muenkel Aff. ¶ 4.)

From 1999 to November of 2003, Brian Turk was the City of Muskego's Director of Planning.  Turk was responsible for the oversight of planning, zoning, geographic information systems, urban forestry and eventually the conservation program.  This included reviewing development proposals and providing a recommendation to the Plan Commission and/or Common Council. (Doyle Aff., Ex. 3;  Turk Dep. 7.)  He did not vote on development proposals and was not involved in the evaluation of sewer issues.  (Doyle Aff., Ex. 3; Turk Dep. 11.)

In January of 1997, Edgewood bought property located at S83W20607 Janesville Road (south of Janesville Road off Hillendale Drive), Muskego, Wisconsin, Tax

3

Keys 2232.980 and 2232.981 (sometimes referred to as "Heather's Way"). (Compl. ¶ 4005; Muenkel Aff. ¶ 5.) The Edgewood property consists of approximately 30 acres of land, with wetlands, and had been used as a horse boarding stable. (Compl. ¶ 4006; Muenkel Aff. ¶ 5; Schmitt Decl. in Oppn To Def.'s PFF ¶ 3.) Prior to the sale, Gayle Schmitt met with Matt Sadowski, the former Muskego City Planner, who wrote her a letter indicating that he thought it would be a great area for high density development. (Schmitt Decl. in Oppn to Def.'s PFF ¶ 8.)

The Edgewood property is zoned agricultural. (Pl. Complaint, ¶ 4006; Muenkel Aff. ¶ 6.) Under the 2010 City of Muskego Comprehensive Plan adopted on March 22, 2001, the Edgewood property remained agricultural, open space, consistent with Rural Density Residential. (Muenkel Aff. ¶ 7.) David L. DeAngelis was the Mayor of the City of Muskego at the time the 2010 Comprehensive Plan was adopted. (Pl. Compl. ¶ 4020.) In April of 2009, after a two-year review, the 2020 City of Muskego Comprehensive Plan was adopted. Under the 2020 Comprehensive Plan, Edgewood's property remains designated Rural Density Residential. (Muenkel Aff. ¶ 8.) The City of Muskego's Economic Development Strategic Plan, which is a component of the Comprehensive Plan, calls for commercial development as well as an increase in density in certain areas of the City. The Edgewood Property is not in the area designated for increased density and/or commercial development. (Muenkel Aff. ¶ 10.)

On or about March 20, 1997, Edgewood submitted to the City a sketch of a preliminary plat for development of approximately 19 lots (referred to as "Emerald Estates"). Edgewood wanted to rezone this property from A (Agricultural with a minimum lot size of 2.5 acres) to RS-3 (Suburban Residence District with a minimum lot size of .5

4

acres) and to develop single family homes. (Schmitt Decl. in Support of PPFF ¶ 13.) The preliminary plat was denied unanimously by the Plan Commission on April 1, 1997. The stated reason for the denial was that the proposal was not in line with the Comprehensive Plan and that it was outside the City's sewer service area. (Muenkel Aff. ¶ 11; Ex. A, Application/Map; Ex. B Mins. of 4/1/97 Plan Comm'n Meeting; Schmitt Decl. in Support of PPFF ¶ 14.)

On or about May 16, 1997, Edgewood submitted a conceptual sketch creating a six lot land division. On June 3, 1997, the Plan Commission, by Resolution P.C. 117-97, deferred consideration of the survey map provided by Edgewood. The stated reasons for the action included concerns with the irregularly shaped lots, wetlands and need for a public street. Additional cited reasons included concerns regarding future development, zoning requirements and the possible configuration of future parcels. (Muenkel Aff. ¶ 12; Ex. C, Application/Map; Ex. D, Minutes of 6/3/97 Plan Comm'n; Ex. E, Plan Comm'r Supplement for P.C. 117-97.)

Resolution P.C. 117-97 was returned to the floor at the June 17, 1997, Plan Commission meeting. The Plan Commission deferred consideration because no new information had been received. (Muenkel Aff. ¶ 13; Ex. F, 6/17/97 Plan Comm'n Mins.; Ex. G, Plan Comm'r Supplement, 6/17/97.) However, Resolution P.C. 117-97 was brought back on July 1, 1997, after the Army Corps completed a wetland designation and field delineation. At that time, Edgewood's representative, Attorney Tim Andringa, had not reviewed the wetland delineation and asked for direction regarding alternative land divisions. The Plan Commission disapproved the land division citing the irregular configuration of the proposed lots and the excessive access points to the collector street

5

Hillendale Drive. (Muenkel Aff. ¶ 14; Ex. H, 7/1/97 Plan Comm'n Mins.; Ex. I, Plan Comm'r Supplement.)

Meanwhile, on April 10, 2001, the Common Council passed Ordinance # 1064, titled "An Ordinance to Amend the Zoning Map and 2010 Comprehensive Plan of the City of Muskego (North Cape/Ryan Road/Boxhorn Drive) (R3 and RS-2 to RS-3)." (Compl. ¶ 4021; Answer ¶ 4021; Muenkel Dep., Ex. 3.) This ordinance was initiated by the City of Muskego to eliminate inconsistencies between the Zoning Code and the Comprehensive Plan. (Muenkel Aff. ¶ 52.) The City of Muskego Common Council adopted Ordinance # 1065 the same day to Amend the Zoning Map and to Amend the Comprehensive Plan of the City of Muskego to facilitate the expansion of the high school and the athletic fields (Muskego-Norway School District)(RS-1 to RS-1/OIP). (Compl. ¶ 4022; Answer ¶ 4022; Muenkel Aff. ¶ 53). Neither ordinance was requested by Edgewood. (Olson Aff., Ex. A.)

Similarly, on July 24, 2001, and August 28, 2001, the City of Muskego Common Council passed Ordinance # 1074 (An Ordinance to Amend the Zoning Map and 2010 Comprehensive Plan of the City of Muskego RSE to B-3/OPD-Dreamland Planned Development) and Ordinance # 1076 (An Ordinance to Amend the Zoning Map and Comprehensive Plan of the City of Muskego, A to RS-3/OPD-The Reserve at Champions Village). (Compl. ¶¶ 4023, 4024; Answer ¶¶ 4023, 4024.) The Common Council adopted Ordinance # 1094 on February 26, 2002, to Amend the 2010 Comprehensive Plan, and, on July 23, 2002, adopted Ordinance # 1109 entitled An Ordinance to Amend the Zoning Map and 2010 Comprehensive Plan of the City of Muskego (Maciolek Limited Partnership and MRED Commercial Development RS-2 and RS-3 to B-3/OPD and RSA/OPD). (Compl.

6

¶ 4026; Answer ¶ 4026; Olson Aff., Ex. A.)  None of these requests was brought by Edgewood.  (Olson Aff., Ex. A.)

On November 21, 2002, Edgewood submitted a sketch Preliminary Plat to subdivide its property into nine residential parcels. (Compl. ¶ 4029;  Answer ¶ 4029.)  It requested to have this item withdrawn without prejudice to address outstanding issues such as the identification of natural features on the sketch, approval of the wetland and stream by the Wisconsin DNR and Army Corps of Engineers, Conservation management and acquisition priorities.  Edgewood's sketch land division plan (P.C. 168-2002) was denied unanimously by the Planning Commission, without prejudice, on December 3, 2002.  (Muenkel Aff. ¶ 15; Ex. J, Application; Ex. K, Letter from Edgewood; Ex. L, Plan Commission Supplement; Ex. M, 12/3/02 Plan Commission Minutes.)  The stated reasons were concerns with the sketch plat lot layouts that appeared to go through areas of environmental sensitivity and the absence of environmental data.  In addition, the natural features of the property were not illustrated on Edgewood's sketch and it was said that the Wisconsin DNR and Army Corps of Engineers would have to approve the wetland and stream crossing for a public road.  Finally, commission members stated that they thought that the layouts may violate the A (agricultural) zoning district minimum requirements.  (Muenkel Aff. ¶  16; Exs. L and M.)

On or about March 20, 2003, Edgewood submitted a Sketch Preliminary Plat to subdivide property into a 21 lot subdivision.   (Muenkel Aff. ¶ 17; Ex. N.)  The City of Muskego Plan Commission denied Edgewood's proposal, P.C. 035-2003, unanimously on April 1, 2003.  The stated reasons for the action were a number of noncompliance issues in the proposal, inconsistency with the Comprehensive Plan, Conservation Plan, the zoning

7

requirements for Agriculture District and the Stormwater Management Plan. Commission members expressed concerns regarding wetlands and an alleged navigable stream on the property. (Muenkel Aff. ¶ 18; Ex. O, 4/1/03 Plan Comm'n Mins.; Ex. P, Plan Comm'n Supplement.)

On April 15, 2003, the Plan Commission adopted Resolution # P.C. 046-2003, which included an 11 acre sketch preliminary plot. (Compl. ¶ 4035; Answer ¶ 4035; Muenkel Aff. ¶ 63.) The proposal was consistent with the 2010 Plan, which depicted medium density residential development in the western portion of the property and multi family development in the east portion of the property, along with the zoning code (RS-2 Single Family Residence District and RESM Residential Multi-Family District). Approval was subject to the grant of the Planned Development District Zoning (OPD) for the Lindemann and Basse properties. Moreover, the property was contiguous to the Moorland Road and Janesville Road intersection where the Economic Development Strategic Plan was calling for commercial development as well as increased residential development and density to support it. (Aff. Muenkel ¶¶ 62-64.)

Similar resolutions were passed on May 20, 2003, and June 17, 2003. (Compl. ¶ 4043; Answer ¶ 4043; Muenkel Dep., Ex. 10.) The approved resolutions provided for the rezoning of property for a planned development overlay which allows a developer various density and setback changes. (Olson Aff., Ex. A.) Edgewood did not request any of the sketch preliminary plats that were the subject of the resolutions. (Olson Aff., Ex. A.)

Edgewood submitted its first formal application for rezoning of property from A (agricultural) to R-3, for a 21 lot subdivision on May 16, 2003. (Muenkel Aff. ¶ 19; Ex. Q,

8

Application.) Three days later, the Planning Commission approved Resolution P.C. 054-2003 for the development of Candlewood Condominiums, which allowed a change from RSA-OPD (Attached Single Family Resident w/ Planned Development Overlay) to residential multi-family housing. This property, owned by Towne Realty, was located in the Moorland corridor where the Economic Development Strategic Plan was calling for higher density to support commercial development and the proposal was consistent with the Comprehensive Plan. (Muenkel Aff. ¶ 65.)

Edgewood's rezoning application was denied on June 17, 2003, for the stated reason that the proposal was not consistent with the Comprehensive Plan, Zoning Ordinance and Conservation Plan. Commissioner Schaumberg and Alderman Madden (both females) voted "Yes" and Mayor Slocomb and Commissioners Hulbert, Brodel, Stinebaugh and Michalski (all men) voted "No" on the issue of whether to recommend rezoning. (Compl. ¶ 4040; Ex. R.)

At the same meeting, the Plan Commission unanimously passed Resolution # P.C. 065-2003 recommending approval of rezoning of the Basse property to include OPD zoning. The properties at issue were already zoned for medium density and high density residential, and followed the City's Comprehensive Plan. The rezoning allowed a planned development overlap which allows a developer various density and setback changes. (Muenkel Aff. ¶ 66.) City Staff met with Edgewood and suggested other options potentially available. (Muenkel Aff. ¶ 17; Ex. R, 6/17/03 Plan Comm'n Mins.; Ex. S, Plan Comm'n Supplement.)

A public hearing on Edgewood's rezoning proposal took place on June 24, 2003. (Muenkel Aff. ¶ 21; Ex. T, 6/24/03 Mins. Public Hearing.) The Common Council

9

discussed and adopted Ordinance # 1143 on July 8, 2003, approving Edgewood's proposal to amend the zoning map from A to R-3. (Muenkel Aff. ¶ 22; Ex. U, 7/8/03 Common Council Mins.)  However, on July 10, 2003, Mayor Slocomb exercised his veto power regarding the action pursuant to § 62.09(8) of the Wisconsin Statutes.  The stated reasons for the veto were:  (1) the various Plan department reports on the issue, the negative support at the public hearing presentation, along with the adverse recommendation of the Plan Commission; (2) the potential nonconformity with a R-3 zoning in that these zoning districts may be eliminated in the near future; and (3) the current 2010 Comprehensive Plan depicted the subject area for agricultural and open space and the proposed amendment would triple the density in the rural area.  (Muenkel Aff., ¶ 23; Ex. V, July 10, 2003 letter.)  During the Common Council meeting of July 22, 2003, Mayor Slocomb noted that he had vetoed Ordinance 1143.  (Muenkel Dep., Ex. 14.)  Thereafter, on August 27, 2003, City of Muskego Director of Planning Brian D. Turk wrote a letter supporting the rezoning of the property owned by Edgewood from Agricultural to RCE/COPD (Country Estate With a Conservation Planned Development District).  (Muenkel Aff. ¶ 24; Ex. W, August 27, 2003 letter.)

On October 28, 2003, Ordinance # 1155, which would have rezoned the Meinerz-Loomis property from RESE and A to B-4 and amended the Comprehensive Plan, was defeated 5 to 2.  (Schmitt Decl. in Support of PPFF ¶ 52.) The cited reason for its defeat was that the 2010 Plan did not provide that the lands would be used for commercial purposes.  (Muenkel Supp. Aff. ¶ 9.)  A principal proponent of the request was female.  (*Id.*, at ¶ 53.)

10

On the other hand, Resolution P.C. 150-2003, which did not involve rezoning, was approved by the Plan Commission. (Schmitt Decl. in Support of PPFF ¶ 54; Compl. ¶ 4053, Answer ¶ 4053; Muenkel Aff. ¶ 67.) This resolution related to the approval of a condominium plat as requested by the owner of an existing apartment complex. The 2010 Comprehensive Plan depicted this area as multiple family residential development and the proposal was consistent with the Plan. (Muenkel Aff. ¶ 67.)

On January 27, 2004, the City of Muskego Common Council enacted, and Mayor Slocomb signed, Ordinance #1162 amending the zoning map and the 2010 Comprehensive Plan. (Olson Aff., Ex. A.) And, on March 9, 2004, and April 27, 2004, the Common Council adopted Ordinance # 1163 and # 1167 to Amend the Zoning Map and 2010 Comprehensive Plan of the City of Muskego (A to R-3-Bowmil and Moorland Road corridor). (Compl. ¶ 4058; Answer ¶ 4058.) None of these ordinances was requested by Edgewood. (Olson Aff., Ex. A.)

Edgewood submitted a formal rezoning application on January 30, 2004, with a sketch preliminary plat for rezoning from A (Agricultural) to RCE/COPD (Country Estate With Conservation Planned Development). (Muenkel Aff. ¶ 25; Ex. X, Application.) A public hearing respecting Edgewood's property (P.C. 008-2004) took place on March 9, 2004. (Muenkel Aff. ¶ 26; Ex. Y, 3/9/04 Mins. of Public Hearing.)

The Plan Commission meeting regarding Resolution P.C. 008-2004 was conducted on March 16, 2004. During the meeting Muenkel explained that the proposed rezoning of Edgewood's property to Country Estate District with a Conservation Planned Development Overlay would allow cluster development with conservancy. Moreover, the proposed rezoning of RCE was permissible under the 2010 Conservation Plan. Muenkel

11

recommended approval of the Resolution. The Plan Commission recommended approval of Resolution P.C. 008-2004 unanimously. (Muenkel Aff., ¶ 27; Ex. Z, 3/16/04 Plan Comm'n Mins.; Ex. AA, Resolution 008-2004; Exhibit BB, Plan Comm'n Supplement.)

A Petition concerning the Proposed Amendment to the Zoning Ordinance by Area Neighbors was filed on March 22, 2004. The petition stated that these neighbors who had signed the petition objected to the rezoning because it would change the character of the neighborhood from rural to residential. Also, the petitioners stated that they objected because the property was in proximity to contamination of the former Muskego Sanitary Landfill, a Superfund site, and that it may be inappropriate to develop the area for residential use without further investigation. (Muenkel Aff. ¶ 28; Ex. CC.) However, on March 23, 2004, the Common Council approved Ordinance 1164 providing for the rezoning of Edgewood's property from A to RCE/COPD subject to the approval of the final plat, Developer's Agreement and Letter of Credit for Heather's Way. (Muenkel Aff., ¶ 29; Ex. DD, Ordinance 1164.)

On July 22, 2004, Planning Director Muenkel prepared a memorandum to Gayle Schmitt with a list of 29 corrections. (Compl. ¶ 4065; Answer ¶ 4065; Muenkel Dep., Ex. 20.) Tom Stang, on behalf of Edgewood, e-mailed Muenkel on September 20, 2004, and requested clarification respecting issues relating to Edgewood's Heather's Way subdivision. (Muenkel Dep. Ex. 22.) That same day, Gayle Schmitt e-mailed Muenkel regarding an extension letter he had previously requested from Edgewood and informed Muenkel that she would "forward a letter of extension upon final decision with sewer." "If we were going to apply for sewer I would be requesting a hold or a withdrawal on 12 lot subdivision". (Muenkel Dep., Ex. 22.)

In response to Stang's e-mail, Muenkel responded, "as of now, density is an issue because it violates the 2010 Plan, however if the sewer district changes in the future it may warrant changing a good portion of the 2010 plan. Nothing is for sure though as it is always up to the elected officials at the time petitioned in the end." (Muenkel Dep., Ex. 22.) Muenkel forwarded Schmitt's e-mail to Mark Slocomb and Sean McMullen and stated:

> This is the third letter (of which all are saved) that Gayle has not obliged by sending an extension letter for her preliminary plat. She keeps making excuses. We usually need an extension letter if there are not any 'unsatisfied objections.' Obviously some objections still exist on this plat, so an extension letter isn't mandatory, but is usually given to the City anyhow. This letter serves as an FYI that no extension letter has been received as a result of the Heather's Way developer's disregard. I'll keep this letter as part of the file as well." (Muenkel Dep. Ex. 22).

In the fall of 2004, the City evaluated whether to include Edgewood's property in the sewer district. (Doyle Aff., Ex. L; McMullen Dep. 33-34.) On September 27, 2004, a City of Muskego Public Utilities Committee Meeting was held. According to the Minutes, at the written request of developer Gayle Schmitt, Chairman Schroeder removed the continued discussion of sewer service for Heather's Way from the agenda prior to the meeting (Muenkel Dep., Ex. 24.)

On November 15, 2004, a Public Utilities Committee meeting took place, the issue of sewer service was discussed, and it was determined that more information on the issue was needed. (Compl. ¶ 4072; Answer ¶ 4072; Muenkel Dep., Ex. 27.) Alderman Eric Schroeder moved to defer the issue to a special meeting on November 23, 2004, and the motion passed. (Compl. ¶ 4074; Answer ¶ 4074; Muenkel Dep., Ex. 27.)

13

At the November 23, 2004 meeting of the Public Utilities Committee, Alderman Pat Patterson moved to require City Engineer/Building Inspection Director Sean McMullen to continue the process of incorporating the Heather's Way development into the sewer service area for 12 connections and to schedule a public hearing before the Common Council to amend the 208 plan. (Compl. ¶ 4075; Answer ¶ 4075; Dep. Muenkel, Ex. 28.) A Notice of Public Hearing to consider the petition of Edgewood Contractors was submitted by the City of Muskego for publication in the Muskego Sun on December 30, 2004, and January 6, 2006. (Muenkel Dep., Ex. 29.) However, on January 14, 2005, Gayle Schmitt wrote to City: "I am in receipt of the typed minutes from December 2004 Public Utilities meeting which includes all of my property in the sewer service area. Therefore I am withdrawing the 12 lot mound subdivision proposal." (Compl. ¶ 4076; Answer ¶ 4076; Muenkel Dep., Ex. 30.)

Meanwhile, on November 2, 2004, the Plan Commission recommended approval of the Preliminary Plat and Yield Plan for 12 single family lots and 2 outlots. (Muenkel Aff. ¶ 30; Ex. EE, Resolution P.C. 009-2004 and 081-2004; Ex. FF, Plan Commission Supplement; Ex. GG, 11/2/04 Plan Commission Minutes.) Further, on November 9, 2004, the Common Council unanimously approved the Preliminary Plat for Heathers Way, a Conservation Subdivision. (Muenkel Aff. ¶ 31; Ex. HH, Resolution 184-2004.)

In December of 2004, Edgewood Contractors submitted a new request to rezone from A to RS-3 (Suburban Residence District). A public hearing on the new request to rezone was scheduled for January 25, 2005. (Muenkel Aff. ¶ 32; Ex. AAA.) However, on January 24, 2005, Gayle Schmitt, on behalf of Edgewood, wrote a letter to Jeff Muenkel that stated, "As I had requested on January 18, 2005, I would like to withdraw from the

14

January 25, 2005 Public Hearing for re-zoning Heather's Way to RS-3. I will be resubmitting in the near future." (Muenkel Dep., Ex. 32.) Although the January 25, 2005, public hearing was scheduled to consider Edgewood's petition to rezone property from agricultural district to RS-3 suburban residential, it did not take place as Edgewood had withdrawn the rezoning petition. (Muenkel Aff. ¶ 33; Ex. II, 1/25/05 Public Hearing Mins.; Ex. JJ Letter dated January 24, 2005; Ex. KK, Letter dated January 14, 2005.)

At the January 17, 2005, Public Utilities Committee meeting Gene Kovacs, Tom Stang and Gayle Schmitt were present to discuss the sewer service for Heather's Way. (Compl. ¶ 4077; Answer ¶ 4077; Muenkel Dep., Ex. 31.) Kovacs explained they were proposing a 46-lot subdivision zoned RS-3, with 15,000-22,000 square-foot lots. (Compl. ¶ 4077; Answer ¶ 4077; Muenkel Dep., Ex. 31.) During the January 21, 2005, Public Utilities Committee Meeting, Alderman Patterson recommended to the Common Council amendment of the 208 Sewer Service Area to include the Heather's Way parcel, approximately 30 acres. (Muenkel Dep., Ex. 34.)

On March 28, 2005, Philip Evenson, Executive Director of the Southeastern Wisconsin Regional Planning Commission, wrote a letter to Mark Slocomb, Mayor of the City of Muskego, about amending the sewer district. (Muenkel Dep., Ex. 36.) The City posted the Notice of Public Hearing concerning the Muskego Sanitary Sewer Service Area Amendment. (Muenkel Dep., Ex. 37.) A SEWRPC representative attended the City's Public Hearing with respect to the inclusion of this property into the Sewer District. (Stauber Aff. ¶ 2; Ex. A.) On April 26, 2005, Resolution No. 072-2005 was approved and signed which amended the sanitary sewer service area for the Muskego area. (Compl. ¶

15

4082; Answer ¶ 4082.) In June of 2005, a Preliminary Draft Amendment to the Regional Water Quality Management Plan for the City of Muskego was created by the Southeastern Wisconsin Regional Planning Commission. (Muenkel Dep., Ex. 42.)

On or about July 15, 2005, Edgewood submitted a new petition to rezone the Heather's Way property from A to RSM (high density multiple Family Residence District) for twenty 12-unit buildings, totaling 240 units, and to amend the 2010 Comprehensive Plan from Agricultural and Open Lands to High Density Residential. (Muenkel Aff. ¶ 34; Ex. LL, Petition.) A public hearing on the petition occurred August 9, 2005. (Muenkel Aff. ¶ 35; Ex. MM, 8/9/05 Public Hearing Mins.) Randy Rozman, owner of a True Value store and a neighbor to the north of the property, spoke in favor of Edgewood's petition to rezone its property. (Compl. ¶ 4095; Answer ¶ 4095.) Subsequently, the Plan Commission recommended deferral of the issue. Its stated reason was the desire to review additional information before acting. (Muenkel Aff. ¶ 35; Ex. NN.)

On September 20, 2005, the Plan Commission recommended that Edgewood's 240 unit rezoning be denied. (Muenkel Aff. ¶ 39; Ex. RR 9/20/05 Plan Comm'n Mins.; Ex. SS, Plan Comm'n Supplement; Ex. TT Resolution P.C. 095-2005.) Thereafter, the Common Council denied Edgewood's request to rezone from A to RSM. (Muenkel Aff. ¶ 40; Ex. UU 9/27/05 Common Council Mins.)

On October 26, 2006, Edgewood submitted a rezoning and 2010 Comprehensive Plan Amendment request. This proposal sought the rezoning of Edgewood's property from A to RSA and the creation of a multi-family, 130 units senior citizen housing development. (Muenkel Aff. ¶ 41; Ex. VV.) A public hearing on the rezoning

16

request took place (Resolution P.C. 125-2006), and on November 21, 2006, the Plan Commission reviewed the rezoning request from A to RSA. (Muenkel Aff. ¶ 42; Ex. WW, Mins.) The Plan Commission unanimously recommended denial of Resolution P.C. 125-2006. The stated reasons for this action were that the rural atmosphere should be kept and the 2010 Comprehensive Plan should be followed. (Muenkel Aff. ¶ 43; Ex. XX Plan Commission Mins.; YY Plan Commissioner Supplement.) A letter dated November 22, 2006, from the City of Muskego Planning Department, was sent to Gayle Schmitt advising her of the Plan Commission decision. P.C. 125-2006. (Muenkel Dep., Ex. 51.)

On November 28, 2006, the Common Council, unanimously voted down Ordinance No. 1240, Edgewood's Request to rezone and amend the Comprehensive Plan stating that it was contrary to the Comprehensive Plan, which depicts the area as having rural density and zoning. (Muenkel Aff. ¶ 44; Ex. ZZ, 11/28/06 Plan Comm'n Mins.)

On February 6, 2007, the Plan Commission passed Amended Resolution P.C. 013-2007 which approved a conceptual subdivision plat of "The Farm". (Complaint ¶4123; Answer ¶4123; Dep. Muenkel, Ex. 55.) Similarly, on April 17, 2007, the Plan Commission approved Amended Resolution P.C. 042-2007. (Compl. ¶ 4124; Answer ¶ 4124.) Neither request was made by Edgewood. (Olson Aff., Ex. A.)

During the time that Edgewood submitted development proposals, the City had in place a process by which to appeal certain decisions to the Board of Appeals or by Administrative appeal, pursuant to Chapter 17, Sec. 2.05 of the Municipal Code. (Moyer Aff. ¶ 3.) At no time did Edgewood appeal to the Board of Appeals or file an Administrative Appeal with respect to any recommendation or decision by the Plan Commission, Common Council or Public Utilities Commission, regarding any of its development proposals. (Moyer

Aff. ¶ 4.)  Moreover, at no time did Edgewood file a certiorari action against the City based on any decision by the Plan Commission, Common Council or Public Utilities Commission or a Mandamus action based on any Plan Commission, Common Council or Public Utilities Commission relating to any decision on its development proposals. (Moyer Aff. ¶¶ 5, 6.)

Further, after an application for a development proposal is submitted, it is evaluated by the City Planning Department.   (Muenkel Aff., ¶ 46.)  The duties of the City Planning Department are to analyze and review the proposal in light of the City's Zoning Code; determine whether the appropriate information has been submitted, take into account the City's Comprehensive plan, ordinances and regulations including the Conservation plan and make a recommendation to the Plan Commission based on this information.  (Muenkel Aff. ¶ 47.)  Depending on the proposal, this analysis may include the input of other City Departments, such as Engineering, Parks and Public Utilities.   (Muenkel Aff. ¶ 48.)   The Plan Commission reviews this information and makes a recommendation to the Common Council as to approval.   The Common Council can either accept or reject the recommendation of the Plan Commission.    (Muenkel Aff. ¶ 9.)

## CONCLUSIONS OF LAW

As discussed above, Edgewood does not oppose the dismissal of its state law claims and disavows any takings claim in this action.  However, the issue remains whether the equal protection claim is ripe because Edgewood never appealed the zoning decision or otherwise pursued any remedies in state court.  In *Williamson County Regional Planning Commission v. Hamilton Bank,* the United States Supreme Court held that "a claim that the application of government regulations effects a taking of a property interest is not ripe until

18

the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." 473 U.S. 172, 186, 105 S. Ct. 3108, 87 L. Ed. 2d 126 (1985). The Seventh Circuit has interpreted *Williamson* broadly, "rejecting attempts to label 'takings' claims as 'equal protection' claims and thus requiring ripeness." *Flying J, Inc. v. City of New Haven*, 549 F. 3d 538, 543 (7th Cir. 2008), citing *Forseth v. Vill. of Sussex*, 199 F. 3d 363, 368 (7th Cir. 2000).

This Circuit has recognized that, in limited circumstances, land use cases raising equal protection claims are not subject to the equal protection requirements if they fall within one of two categories, pleading:

> (1) the malicious conduct of a government agent, in other words, conduct that evidences a spiteful effort to 'get' him for reasons unrelated to any legitimate state objective; or (2) circumstances, such as prayer for equitable relief and a claim that would evaporate if the government body treated everyone equally that sufficiently suggest that the plaintiff has not raised just a single takings claim with different disguises.

*Forseth*, 199 F.3d at 371.

The court finds that Edgewood has presented a bona fide equal protection claim and may proceed without first exhausting any available remedies in state court. Edgewood alleges that defendants intentionally treated it differently than other businesses by denying Edgewood's requests for land use changes over a number of years because Edgewood was owned and operated by a woman. In analyzing whether Edgewood raised a legitimate equal protection claim, this court does not pass on the viability of these assertions; rather, Edgewood's assertions are sufficient because Edgewood alleged ill-will or malice.

Focusing on the equal protection claim, it is clear that Edgewood has advanced two theories under the Fourteenth Amendment. The Fourteenth Amendment secures individuals against intentional and arbitrary discrimination by the government. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000). Typically, such claims are brought by persons alleging that the government has discriminated against them because of their race, gender, ethnicity, religion, or sexual orientation. *McDonald v. Vill. of Winnetka*, 371 F.3d 992, n. 3 (7th Cir. 2004). However, the Seventh Circuit Court of Appeals has recognized equal protection claims brought by a "class of one" when "(1) the plaintiff charges that she has been intentionally treated differently from others similarly situated and (2) that there is no rational basis for the difference in treatment or the cause of the differential treatment is a 'totally illegitimate animus' toward the plaintiff by the defendant." *Id.,* 371 F.3d at 1001.

That being said, courts have struggled to apply the contours of a class of one case. *See Jennings v. City of Stillwater*, 383 F.3d 1199, 1210-11 (10th Cir. 2004) As stated by the Tenth Circuit:

> All have recognized that, unless carefully circumscribed, the concept of a class-of-one equal protection claim could effectively provide a federal cause of action for review of almost every executive and administrative decisions made by state actors. It is always possible for persons aggrieved by government action to allege, and almost always possible to produce evidence, that they were treated differently than others, with regard to everything from zoning to licensing to speeding to tax evaluation. It would become the task of federal courts and juries, then, to inquire into the grounds for differential treatment and to decide whether those grounds were sufficiently reasonable to satisfy equal protection review.

20

Recently, the United States Supreme Court in *Engquist v. Oregon Department of Agriculture* where the Court held that the " 'class of one' theory of equal protection has no place in the public employment context." --- U.S. ----, 128 S. Ct. 2146, 2148-49, 170 L. Ed. 2d 975 (2008). Since then the Seventh Circuit has focused on the rationale of *Engquist* suggesting that individualized, discretionary decisions can rarely, if ever, be challenged in class-of-one actions. *Srail v. Village of Lisle, Ill.,* 588 F.3d 940, 944 (7th Cir. 2009). However, the Seventh Circuit has not published a decision extending the boundaries of *Engquist* beyond the public employment context. In any event, this court need not apply *Engquist* inasmuch as it finds that Edgewood has not demonstrated that it is entitled to judgment on its equal protection claim.

As noted above, to establish a prima facie "class of one" equal protection claim, a plaintiff must show "(1) [it] has been intentionally treated differently from others similarly situated; and (2) there is no rational basis for the difference in treatment or the cause of the differential treatment is a totally illegitimate animus toward" plaintiff by the defendants. *Maulding Dev., LLC v. City of Springfield*, 453 F.3d 967, 970 (7th Cir. 2006) (citations and quotation marks omitted). Further, the plaintiff must demonstrate that it was treated differently than someone who is prima facie identical in all relevant respects. *Purze v. Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002). Consequently, Edgewood carries a high burden in establishing someone who is similarly situated in a "class of one" equal protection case. *McDonald*, 371 F.3d at 1001.

While there is no precise formula to determine whether an individual is similarly situated to comparators, a court may grant summary judgment when it is clear that no reasonable jury could find that the similarly situated requirement has been met. *Maulding*

21

*Dev., LLC,* 453 F.3d at 970. For example, "individuals were not similarly situated in a "class of one" equal protection case where the individuals submitted different variances than the plaintiff requested, submitted their plats during different time periods, or had requests granted by different and previous Boards." *Id.* (citing *Purze v. Vill. of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002)).

The "class of one" case is "one in which a public official, with no conceivable basis for his action other than spite or some other improper motive (improper because unrelated to his public duties), comes down hard on a hapless private citizen." *Lauth v. McCollum*, 424 F.3d 631, 633 (7th Cir. 2005). In *Esmail v. Macrane*, 53 F.3d 176, 178 (7th Cir. 1995), the Seventh Circuit recognized that "deep seated animosity" on the part of the defendant supports an equal protection claim. "Such animosity occurs when 'a powerful public official picks on a person out of sheer vindictiveness,' or when an official acts 'for the sole and exclusive purpose of exacting retaliation and vengeance against' the plaintiff." *Bell v. Duperrault*, 367 F.3d 703, 709 (7th Cir. 2004)(citing *Esmail*, 53 F.3d at 178). Stated differently, "[u]nder the totally illegitimate animus approach, a plaintiff must show that the government action was a spiteful effort to get [her] for reasons wholly unrelated to any legitimate state objective." *Nevel v. Vill. of Schaumburg*, 297 F.3d 673, 682 (7th Cir. 2002)(citation and quotation marks omitted). Inconsiderate, inappropriate, inefficient, or even downright rude behavior does not rise to the level of "deep-seated animosity". *Bell v. Duperrault*, 367 F.3d 703, 709 (7th Cir. 2004).

In the pending case, Edgewood has failed to demonstrate that it was treated differently than anyone who is prima facie identical in all relevant respects. Indeed, Edgewood admits that "these comparators are not identical," but argues that when "a

22

[p]laintiff has such a wealth of evidence of discrimination and hostility as the Plaintiff here does, her ability to win justice should not depend on the sheer happenstance of there existing an identical comparator." (Pl.'s Br. In Opp'n to Def.'s Mot. for Summ. J. 14).

Edgewood relies on comparisons between two of its own proposals and four other proposals to support its assertion that similarly situated developers were treated more favorable. (*Id.*, at 11.) First, Edgewood cites the 2003 21-lot unsewered development. Yet none of the three proposed comparators involve the same type of zoning request sought by Edgewood. Moreover, the proposed comparators are found in regions of the City of Muskego with much higher density.

The first comparator is Towne Realty's Candlewood Condominiums. Edgewood claims that Towne Realty's plan, which consisted of 51 units, created substantial rezoning and amendment of the Comprehensive Plan. It believes that Towne Realty's proposal is very similar to her 21-lot proposal because Candlewood Condominiums was adjacent to a small commercial use with farmland beyond it. (Pl.'s Br. 12). However, initially, Towne Realty's property was zoned RSA-OPD, Attached Single-Family Residence District with a Planned Development Overlay District. (Muenkel Aff. ¶ 65.) Resolution PC 054-2003, approved by the Plan Commission, recommended an amendment to the Comprehensive Plan changing how the Candlewood Condominiums land could be used. (Muenkel Aff. ¶ 65.) Hence, the property was not rezoned; rather, the proposal called for a change to the Planned Development Overlay (OPD) district from 1 unit per 10,000 square feet of area to 1 unit per 12,147 square feet of area. (Muenkel Aff. ¶ 65.) Land set aside for residential single family housing was changed to residential multi-family housing.

The changes sought by Edgewood and Towne Realty from the Plan Commission differed too much for their proposals to be considered similarly situated. Edgewood sought residential zoning; Towne Reality's property was already zoned residential. Moreover, the Towne Realty property is in the "Moorland Corridor" where higher density geared to supporting commercial development was sought under the Economic Development Strategic Plan. (Muenkel's Aff. ¶ 65). In contrast, Edgewood's property was identified as rural density residential property under the Comprehensive Plan and has never been targeted for higher density development. (Muenkel's Aff. ¶¶ 7,10). Additionally, the Towne Realty property is part of an OPD district[1] which effects how the Plan Commission and City Council evaluate developers' proposals.

The second comparator is the Basse property. On June 17, 2003, the Plan Commission recommended to approve the "rezoning" of Basse. Although the rezoning proposals for the Edgewood and Basse properties created a change in density, they are very different in nature. The Basse property was already zoned for medium density and high density residential. The Planning Commission passed a resolution recommending a planned development overlay (OPD) zoning designation. Edgewood did not seek inclusion into the OPD zoning district; instead, Edgewood sought a new designation, from agricultural to R-3.

Edgewood offers a third comparator for its 2003 proposal, the Woodland Creek Estates. On July 27, 2004, the Common Council passed and Mayor Slocomb signed Ordinance #1174 amending the zoning map and the 2010 Comprehensive Plan. Woodland

---

[1] According to City of Muskego Municipal Code, Chapter 17, Section 9, the purpose of a planned development district is to "allow for greater freedom, imagination, and flexibility in the development of land while insuring substantial compliance to the intent of the normal district regulations of this ordinance."

24

Creek Estates was rezoned from A to RS-2/OPD. The parties agree that Edgewood and Woodland Creek Estates shared the same original zoning designation of agricultural and both were owned by females. (Pl.'s Brief in Reply 5; Def.'s Brief 13; Muenkel Aff. ¶ 72). However, there is one critical distinction: the Woodland Creek Estates is adjacent to the Muskego High School and the properties north and west of the school have residential densities that are found in an RS-2 zoned district (Muenkel Aff. ¶ 72) making Woodland Creek Estates situated in a developed area. Nothing in the record suggests to this court that Edgewood's property is located in a similarly developed area.

Finally, Edgewood claims that there was a development similarly situated for comparison to Edgewood's 2005 Heather's Way condominium proposal. Edgewood asked to rezone Heather's Way from A to RSM (high density Multiple Family Residence District) for 240 total units and to amend the 2010 Comprehensive Plan from Agricultural and Open Lands to High Density Residential. The Plan Commission recommended that Edgewood's proposal to rezone be denied, and subsequently, on September 27, 2005, the Common Council denied Edgewood's request for rezoning. The same day, the Common Council approved Ordinance # 1201, which rezoned the Loughney property from A to RCE/COPD and amended the 2010 Comprehensive Plan from agricultural and open lands to Rural density residential. (Muenkel Aff. ¶ 75; Schmitt Decl. in Support of Pl.'s PFF¶ 112.) The only argument Edgewood offers that Loughney was similarly situated is that both properties were zoned, agricultural initially. Defendants concede that the Loughney development was also "very similar to the Edgewood property in that it had approximately the same amount of land with some environmental features." (Def.'s Brief 6).

Although the properties shared similar characteristics, the owners sought remarkably different changes. The Common Council rezoned the Loughney property as a country estate district and amended the Comprehensive Plan to designate the property as Rural density, which is markedly different to what Edgewood sought, to rezone its property to a *multiple family residence district* and to amend the Comprehensive Plan to designate the property as *high density*. The Loughney development when completed will create units with lots of 120,000 square feet. The Edgewood development, if it had been approved, would have consisted of a total of 240 units with lots between 5,000 - 20,000 square feet. Thus, the Loughney proposal fails to qualify as a comparator for Edgewood's class of one claim, because the rezoning requests and density developments were remarkably dissimilar. Also, the court is mindful that the zoning designation granted to Loughney was akin to the zoning designation that the Plan Commission and Common Council approved for Edgewood in 2004. (Def's Brief at 6).

Because Edgewood failed to find a similarly situated development, the court need not address whether there is "no rational basis for the difference in treatment." Nevertheless, it is quite clear from the analysis above that defendants had a rational basis for denying approval of Edgewood's proposals: to prevent increased density in that area of Muskego and to maintain an agricultural district where Edgewood's property is situated. Indeed, the record reflects that the City suggested that a conservancy type of development would be appropriate given the rural nature of the property and the environmental issues involved. Initially Edgewood proposed this type of development but withdrew its request and changed the request to multifamily, the highest density possible for residential development. Consequently, Edgewood has not brought forth evidence required by applicable case law to

26

establish a class of one discrimination claim based on the equal protection clause. Hence, defendants' motion for summary judgment regarding Edgewood's class of one discrimination claim must be granted.

Next, Edgewood argues that the defendants violated its equal protection rights by treating Edgewood differently from other property owners because its owner and representative is a woman. The same standards for proving intentional discrimination apply to Title VII and §1983 equal protection claims. *See Burks v. Wis. DOT*, 464 F.3d 744, 751, n.2 (7th Cir. 2006); *Williams v. Seniff*, 342 F.3d 774, 788, n.13 (7th Cir. 2003). Edgewood may establish discrimination in one of two ways: by presenting a "convincing mosaic" of direct or circumstantial evidence under the direct method of proof or by utilizing the indirect, burden-shifting method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed.2d 668 (1973). *Burks*, 464 F.3d at 751 n.3.

Under the direct method, a "convincing mosaic" of circumstantial evidence allows a jury to infer intentional discrimination by the decisionmaker. *Blise v. Antaramian*, 409 F.3d 861, 866 (7th Cir. 2005). Three types of circumstantial evidence can create this proof. First, a plaintiff may present direct evidence by way of suspicious timing, ambiguous oral or written statements, behavior toward or comments directed at others in the protected group, as well as other bits and pieces of occurrences from which an inference of discriminatory intent might be drawn. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). Second, a plaintiff may have evidence (whether or not rigorously statistical) demonstrating that similarly situated employees outside the plaintiff's protected class received systematically better treatment. *Id*. Third, a plaintiff might show that the plaintiff was qualified for a job but was passed over for or replaced by a similarly situated person not in the protected class, and

that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination. *Id.* In any event, the circumstantial evidence "must point directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003). Even circumstantial evidence of bigotry on the part of the decision maker is not enough without this causal link-"there must be a real link between the bigotry and an adverse employment action." *Id.*

To establish a prima facie case of discrimination under the burden shifting paradigm of *McDonnell Douglas,* the plaintiff must show that: (1) she is a member of a protected class; (2) she is similarly situated to members of the unprotected class; (3) she suffered an adverse action; and (4) she was treated differently from members of the protected class. A prima facie case under *McDonnell Douglas* constitutes a rebuttable presumption of discriminatory intent. If the defendant meets this burden, then the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action. *Burks*, 464 F.3d at 751. The plaintiff must present evidence that the defendant's stated reason is merely a pretext for discrimination. *Id.*

Edgewood maintains that, no matter how the evidence is characterized, the declaration of former Alderman and Mayor, Charles Damaske, carries substantial weight. In his declaration, Damaske states that he was the Alderman in the City of Muskego from 2002-2004 and the Mayor from April of 2005 until November of 2006. He was an Alderman at the time of the July 8, 2003, meeting at which the Common Council voted to approve Edgewood Contractors's proposal for a 21 unit development in its Heathers Way property. Damaske voted to approve the project. Mayor Slocomb vetoed the Council's July, 2003, approval of Edgewood's 21 lot proposal. This was the only veto that occurred during

28

Damaske's time on City Council and during his time as mayor. Damaske drew the following
conclusion:

> I am aware of no sensible basis for this veto and am left to
> conclude that it occurred only because Gayle Schmitt was
> female. I believe that if everything else had been the same and
> she had been one of the male developers who came before the
> City for an approval, there would have been no veto.

Damaske also stated that he followed the progress of the 2005 proposal. He believes that
Schmitt was treated less respectfully than male developers by City Planner Brian Turk and
City Engineer Sean McMullen and that he did not see similar disrespect during presentations
by male developers. Damaske adds that he observed other female developers having
difficulty getting their projects approved.

The most troubling aspect of Damaske's affidavit was that he was not the
person who exercised the veto regarding the Heather's Way property. Mayor Slocomb
exercised the veto and Damaske's affidavit is nothing more than pure speculation. There is
no indication that Damaske had a discussion with Mayor Slocomb or had any direct
knowledge of facts that gave rise to the veto. Indeed, Mayor Slocomb exercised the veto
pursuant to Wis. Stat. § 62.09(8) and his cited reason – density – was consistent with the
concerns discussed during the Plan Commission of June 17, 20003, the public hearing on
June 24, 2003, and the Common Council meeting of July 8, 2004. Moreover, Damaske
expressed density concerns when voting to approve Edgewood's 2005 condominium
proposal.

Edgewood cites additional remarks that it believes "provides a sufficiently
compelling mosaic of discriminatory animus toward" Edgewood on the equal protection

29

theories. These comments include a purported statement by City Engineer McMullen to another Edgewood employee: "If she thinks I was hard on her before, just wait until now." Schmitt's father, Jerome Kontowicz, submitted a declaration in which he stated that during the November 21, 2006, Plan Commission meeting, City Planner Muenkel said that the City would never approve anything no matter what Gayle submitted. At the same meeting, Kontowicz also heard an unidentified alderman say that Gayle was welcome to bring in as many plans as she wanted and to spend as much money as she wanted but they would never approve anything she brought before them. Schmitt's recollection, as set forth in her declaration in response to defendants' proposed findings, is as follows:

> Mr. Muenkel specifically told me at the Plan Commission meeting in November of 2006 that he would 'never approve or recommend approval' of any development from me. Chris Buckmaster then commented that I had the right to bring in as many maps and proposals as I could afford, but they would never approve anything for me, a female developer.

The problem with this evidence is that the audio recording of the November 21, 2006, Plan Commission meeting is included in the record as Exhibit A. The court appreciates that Gayle Schmitt and her father may have left the meeting believing that nothing would ever be approved. However, what was stated on the record was that no development would be approved to the extent that it deviated from the Comprehensive Plan in the absence of a compelling argument made by Edgewood. It was stressed that Edgewood had sought to increase density repeatedly, and that Edgewood's arguments would be best heard by the 2020 Comprehensive Planning Committee. A second speaker said that the council could not support the density and must remain committed to the Comprehensive Plan until that plan is changed. A third speaker emphasized that residents have expressed their desire for the

City to remain true to the Comprehensive Plan. He also noted that an alternative plan proposed by Edgewood for fewer units was approved in 2004, but later withdrawn by Edgewood.

More importantly, Edgewood blurs the requirements under its class of one and gender discrimination theory. If Edgewood is truly creating a mosaic under the gender discrimination theory, the evidence must point towards discriminatory actions taken by the defendants because Gayle Schmitt is a woman.

The only statement in the other evidence in the record that implicates Schmitt's status as a female was one heard by Gayle Schmitt during the June 17, 2003, Plan Commission meeting. At that time, Gayle Schmitt heard Plan Commission member Hulbert *or someone near him* say " What does that broad think she's doing bringing the much density?" (Schmitt Decl. ¶ 42.) Schmitt cannot confirm that the statement was made by Hulbert or any other agent of the City. Hulbert filed a declaration stating that he does not recall using the term broad and it would not be his normal practice to do so. The statement itself refers to density as the issue. That the proposals were contrary to the Comprehensive Plan was a theme echoed during the various meetings and hearings.

Put simply, there are no statements in the record attributable to Turk, McMullen, or Muenkel or is there other circumstantial evidence pointing directly to Schmitt's gender as a basis for the City's actions towards Edgewood. Moreover there is not any evidence of a custom or policy that would otherwise implicate the City of Muskego. Defendants have proffered legitimate, nondiscriminatory reasons for their actions insofar as they consistently based their decisions on density citing the rural nature of the area under the Comprehensive

Case 2:07-cv-01093-CNC   Filed 03/05/10   Page 31 of 32   Document 56

Plan.  Nothing in the evidence would allow a jury to conclude that these cited reasons were

pretextual.  Now, therefore,

IT IS ORDERED that defendant's motion for summary judgment (Doc. # 21)

is granted.

IT IS FURTHER ORDERED that this case is dismissed.

Dated at Milwaukee, Wisconsin, this 5th day of March, 2010.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE